Or, let's see, LaPierre. We have a student. Do we have someone to introduce our student to the court? I'm Bruce LaPierre, Vice Dean of the University Law School. Alright. I'm Brian Walsh. I'm Brian Tadman. And we are here with Mr. Joseph Boylan, the ex-client commissioner. We'd like to argue this case. Alright. Mr. Boylan, may I proceed when ready? May it please the court. After being attacked by Raymond Stallings, Vincent Walls did exactly what prison officials would have wanted him to do. He turned in the shank used in the assault and reported the incident to prison officials. Was he injured at all in that attack? He was injured in a minor way, Your Honor. Was he treated for any injury? I do not believe he was treated for any injury. In the scuffle, he was able to get the shank out of Mr. Stallings' hand and, in the process, injured Mr. Stallings. But I do not believe that he suffered any injury. Having received this information, though, the prison officials exposed Mr. Walls to substantial risk of serious harm. And they did this by issuing a disciplinary notice, which was widely circulated throughout the prison and which detailed precisely how Mr. Walls cooperated with prison officials. What's the prison's normal procedure? The prison's normal procedure with respect to the disciplinary notice? Yes. It is to provide a disciplinary notice to both parties that are involved in an altercation. In this case, the problem was that the disciplinary notice explained explicitly how Mr. Walls cooperated with the prison officials and ratted on Raymond Stallings. So was this unusual for the disciplinary notice to be disseminated, or was it just unusual with the detail included? I'm not sure as to the content of other disciplinary notices, Your Honor, but it is common practice for such notices to be issued to any individual who is subject to disciplinary sanction. So you're not sure this was even unusual. You're just saying that because that was the notice given to the alleged offender, it created a substantial risk of harm. Yes, Your Honor. Is that right? Yes, Your Honor. The reason that it created the risk of harm is because it detailed precisely how Mr. Walls had cooperated with officials and how he had snitched effectively on Mr. Stallings. Now, this Court has recognized that snitches face an obstacle. When you say snitch, you mean he reported that Stallings attacked him with a shank? He reported that Stallings had attacked him with a shank and turned in that shank to the officials. I wonder what you mean by snitching. I mean, most times when a victim is assaulted and reports it to the authorities, we don't refer to it as snitching, but that's what we're talking about, right? Yes, Your Honor. All right. The real problem with snitching comes not from the reporting of the action itself, but rather from the fact that the inmates know that the individual has cooperated with prison officials. This Court has stated on a number of occasions that snitches, individuals known as snitches for cooperating with prison authorities, do face an obvious and substantial risk of serious harm of retaliation from other inmates. So is that true for a victim as well as for a third party who witnesses and reports? Are they treated exactly the same in the prison environment? I can't speak exactly to how prison individual inmates would treat that type of situation as opposed to a third party versus Mr. Walls, but generally speaking any individual known as a snitch throughout the prison population will be subject to a risk of retaliation both from the person they snitch on and from other individuals who What do you mean by snitch? You keep saying snitch. I mean How do you define that? A snitch is an individual who cooperates with prison officials and who in the process becomes known that he has done that sort of cooperation. So that includes a victim of a crime? Yes, sir. Yes, Your Honor. Do you consider snitch to be a disparaging term? I personally do not consider snitch to be a disparaging term, but it's clear I think both from this court's cases and from the events that happened in this case that other inmates view snitches in a disparaging manner. Now after the prison officials issued this disciplinary notice, Is there any evidence that they were involved in disseminating it beyond the people being disciplined? They did not personally hand the notice to any of the inmates, Your Honor, other than Mr. Stallings. But as a matter of prison policy, this disciplinary notice, which stated on its face that Mr. Walls had cooperated and had reported Mr. Stallings the attempted assault with the shank, that was then given directly to Mr. Stallings, which he was then able to pass around the entire cell house. So it almost sounds like you're arguing for rule that in Iowa, if they think due process to the alleged offender requires notice of the claim against him, that to avoid an Eighth Amendment violation, they have to put the victim in protective custody? Is that the rule we should adopt? No, Your Honor.  Well, you said the usual practice is that they disseminate the violation report to the alleged offender. And I gather you're saying whenever that happens, the offender can pass that information around the facility. Possibly. The problem is not with the actual notice itself or the reporting, but with what happened afterwards. When Mr. Stallings was able to pass the notice around. Do we know that happened in this case, or is that just a surmise? Mr. Walls testified to that at trial, and it's also available throughout the record, including in his grievance and other pieces. Well, how does he know what Stallings did with the notice? He knows because he saw the consequences of it. In the immediate aftermath of the passing around of the notice, a number of individual inmates came over to his cell and called him a rat and a snitch, immediately after the notice was issued. This is according to Mr. Walls' grievance. Now, it's clear that after this happened, Mr. Walls knew that he was facing serious dangers. So what did he request to protect him? He requested administrative segregation status, Your Honor. Although he did deny protective custody in a single situation, it's clear that after the notice was issued, he then became concerned about the consequences that he would face from the prison population because he had become known as a snitch. For example, in a disciplinary court. The snitch angle is interesting, and you rely on Norman v. Schutzel, right? In part? Yes. I looked at the district court's opinion, and there wasn't a single mention of snitch or rat or anything like that. My question is, was the case presented to the district court in this manner? The case, because it was a bench trial, Your Honor, the case was not presented or argued specifically in the post-trial brief, document number 51 on the docket. It was not presented as a snitch case. But that doesn't mean that the district court can ignore Mr. Wall's testimony, which is material to his claims. Was Norman cited by the plaintiff to the district court? I do not believe Norman was cited. I think Irving was cited in the post-trial brief, but I can't recall offhand. So the district court has to dream up the theory on its own? No, Your Honor. We're not asking the district court to dream up a theory. We're asking the district court to respond to the material evidence that Walls presented, the evidence that he testified to at trial that he had been labeled a snitch and that the reason that he faced so many problems was because of that label. The trial counsel also elicited from each of the defendants specific admissions that they had knowledge of, generally speaking, the risks that snitches face. Now, there is also evidence that Mr. Walls had been known as a snitch and had complained directly to prison officials that he had been a snitch throughout the record. Because snitches face an obvious risk under this court's precedent, it was the judge's obligation to address that evidence, regardless of the trial counsel's admitted failure to articulate that precise risk in the very short post-trial briefing. And that's precisely the problem with the clear error that the district court committed in this case is that she viewed the evidence narrowly. She ignored substantial record evidence that Mr. Walls had been known as a snitch, primarily the March 11th disciplinary notice, which was passed around the entire cell block, which created Mr. Walls' risk. Now, the inquiry as to whether a substantial risk of serious harm exists is an objective one. And in this case, that fact, the March 11th disciplinary notice and the fact that it was widely circulated to cause Walls to be known as a snitch created an objective risk of serious harm for Mr. Walls. Well, didn't they investigate and confront both accused and accuser who both declared that we have no problem? Yes, Your Honor, they did do that. They did investigate after the first assault. But the problem with that investigation is that it does nothing to address the actual risk that Mr. Walls faced as a snitch because he was not known as a snitch until after the disciplinary notice was issued, after that investigation had been completed. The same is true of the protective custody. Although the individual officials did place Mr. Walls in protective custody, that was only immediately following the first fight and not when he had become labeled a snitch. It was after that that the real risks and the real failure of the officials became clear in this case. Now, because the district judge below or because the magistrate judge below considered only what Walls and Stallings had reported and told prison officials in considering whether there was an objective risk of serious harm, she considered just subjective evidence, and she misapplied the constitutional standard and turned this into a subjective inquiry instead of an objective one. Well, don't we have lots of cases on the objective inquiry where we rely on what was told to the prison officials by the inmates? It's true, Your Honor. That doesn't turn it into a subjective, I don't think. No, Your Honor. Relying on what subjective evidence that is available is permissible because it is relevant evidence. But the problem in this case was the fact that the judge looked only at subjective evidence. She ignored the substantial record evidence, such as the March 11th disciplinary notice, that established that Mr. Walls did face an objective risk of serious harm. Now, in the context of that risk, the officials' failure to take any steps to respond to the threats of retaliation that Mr. Walls faced, both from Mr. Stallings and from the prison population more generally, was an unreasonable response. Well, is there any evidence that he was more likely to be assaulted by the prison population in general? Because it seems that both the subsequent assault by Stallings on the prison yard and the alleged assault instigated by Stallings from Walls were all related to the dispute between Walls and Stallings and had nothing to do with a general attitude of the prison population against snitches. It's unclear what the specific motives of Stallings and Voiles were as to the second and third fights. But the second fight occurred in the moment that Mr. Walls was in the same yard as Mr. Stallings. And even if he was attacking him for the first assault or because of the original conflict that the two individuals had had, he had another additional reason to attack Mr. Walls. The same is true of Mr. Voiles. Mr. Voiles was one of the inmates that had come to the cell block to threaten Mr. Walls after the disciplinary notice was issued. He called him a rat and a snitch. And before the third attack, he also said, hey, remember me, snitch. But it still seems like that was motivated by his first attacker and not some general population attitude. It seems like this is fundamentally a fight between these two inmates that one brought in an ally, so to speak, but not a problem enhanced or created by the prison officials in their performance of giving notice. It's possible that that would be the motive of Stallings and Voiles. But it's our contention that Mr. Walls was widely known as a snitch. And under this court's precedent, snitches do face an obvious risk of serious harm. It's at least plausible that the reason that Mr. Walls was attacked by both Stallings and Voiles was precisely because he had been labeled a snitch. Now, I agree that the mixed motive is a potential problem, but the fact that the officials took no steps at all to address the possibility even. They didn't investigate the nature and extent of Voiles' and Stallings' motives for the second and third fights. They didn't analyze or investigate whether or not other individuals possibly had animosity towards Mr. Walls for that snitch. Counsel, you're in your rebuttal time. You can continue if you like or you can reserve. That's fine. If this court has no further questions, I'll just yield the rest of my time. Thank you. Next, we'll hear from Mr. Hill. May it please the court. The case before the court today is a failure to protect case from the Iowa State Penitentiary in Fort Madison, Iowa. The offender, Vincent Walls, claims that the prison staff had failed to protect him from an assault by another offender. The Iowa prison officials asserted that they did not violate any constitutional standard and that the trial court correctly applied the law. Therefore, the prison officials assert that on appeal, this decision should be affirmed. In examining the merits of the case, this, as a failure to protect case, goes to the standard of both the objective and subjective elements in order to prove an Eighth Amendment violation. The starting point, of course, is the objective standard in whether or not Mr. Walls was subject to a serious deprivation or a serious security issue while in the maximum security prison. And that is the starting point is that this did occur in a maximum security prison. Prisons are a dangerous and violent place, and the prison officials have taken steps to alleviate and reduce this risk. It's not a total guarantee of safety, but steps are taken to protect offenders. One of the steps taken is to have a system by which offenders can report enemies, an enemy alert system. The evidence in this case established that when Mr. Walls came into prison, he was alerted to such a system. And that periodically through classification reviews, offenders are given the opportunity to notify staff of any potential issue which they may have with a particular offender. Was there evidence here of gang-related animosity between these two or some other source of conflict? No. Prior to the first incident between Stallings and Mr. Walls, there was no indication of a problem. As well, prior to the third incident between offender Walls and Mr. Boyles, there was no indication that either were an enemy situation. As to the second situation, where it was the repeat fight six months after the original altercation between Mr. Stallings and Mr. Walls, efforts had been made in between that period of time to measure the level of risk between the two. Both inmates had been interviewed and the situation discussed with them by both Supervisor Tadman and Investigator Van Wye as to whether or not they anticipated a problem and the offenders did not think that there would be a problem between the two of them. Accordingly, the decision was made to allow them to be in the same area. Part of the problem in this case is when dealing with maximum security offenders, one cannot always have total separation in every situation. In this particular case, what happened was in the second assault between Mr. Walls and Mr. Stallings, Mr. Stallings saw Mr. Walls. Security staff responded, responded appropriately. There was a testimony from Officer Gansey who was watching from five stories above in a tower and loaded a shell into his gun and was ready and willing to shoot but believed that the correctional staff would respond quickly to the situation to prevent the assault and in fact is what happened and a serious injury was prevented. Counsel, what is there in the record in terms of the knowledge of prison officials about heightened dangers for individuals who cooperate with prison officials? And that is always a danger in prison, being labeled as a snitch or the perception of being labeled as a snitch. And I think that the starting point in that analysis is that an offender themselves, in this case Mr. Walls, knows to some extent when they're in danger. He indicated he had sort of a radar for this. We're not saying that the safety of an offender is totally dependent upon their own assessment and their own physical well-being and sense. The prison officials are responsible as well. But the prison officials have to give the opportunity to the offender who knows what level of risk is out there. In terms of the prison disciplinary system, subject to the law, Wolf v. McDonald, this court has had what I would say are the confidential information cases before the court dealing with how certain offenders who can protect themselves have a system by which they can say that they're confidential informants and that information is not disclosed to the other offender who's being charged. Well, if you're aware of that dynamic at work, why would you include descriptions in the distributed notice that could be interpreted as creating a snitch identity for one of the persons involved? I understand, and the notice that was given, specifically the notice that we're referring to, is the notice provided to Mr. Walls. Mr. Walls must be given notice and opportunity to defend himself, so he must be told what in fact exists, the evidence existed before him. There's no evidence that the report given to Mr. Walls was the same report given to Mr. Stallings. Those two incidents were, both inmates were disciplined. It's unclear what the motivation of Mr. Walls was. Clearly, Mr. Walls approached staff the next day and said, look, I was involved in an altercation yesterday with Mr. Stallings, here's the shank. Are the notices part of the record? Yes, they are. It's unclear. The reason Mr. Walls may have done that was to somehow avoid that the shank would be found in his possession, but when it was investigated, Mr. Stallings was observed with, for lack of a better word, a knot on his head, which indicated that he had been in a scuffle. Both offenders were charged and disciplined with the fight. In this case, examining further what the objective system was out there, when Mr. Walls reported that he had a shank, the next day he was immediately interviewed by a Lieutenant Shandstrom and the cell house was locked down. Immediate action was taken to reduce the risk. As well, the matter was investigated. He was spoken to by Mr. Tadman and Mr. Van Wy. Subjectively, in terms of what the prison officials knew or didn't know, clearly before the first fight with offender Stallings, the prison officials didn't have a notice that there was a problem between the two. As well, there was no indication that Mr. Boyles was having a problem with Mr. Walls. There was no request for an assistance by Mr. Walls that Stallings was a problem. And part of this is dependent upon the prison staff can interview the offenders and ask them what you think you're in fear of safety, because not everyone can be placed in a separate prison, not everyone who cooperates. It's a small world in the prison environment. Did Mr. Walls ever ask for transfer or segregation? He had asked for a transfer, and that's part of the rub here in this particular case is he wanted to transfer. He wanted to go to a different prison, and there was evidence that he was a maximum security inmate and other prisons didn't want him or he didn't qualify for their program. So one of those situations where you have two maximum security offenders who are perhaps enemies, you can do very little to separate them because they're both maximum security offenders. So why shouldn't the district court have interpreted his request for a transfer as seeking some sort of protection? They did in an extent. There was a preliminary injunction filed in this case where he requested to be transferred. I don't think the mere, I guess, the argument, and it could be a theory, is that the request to be transferred indicates in and of itself a failure to protect argument. The problem is under the failure to protect rubric and language, an offender can't make a specific generalized threat of I'm in fear here. That is to manipulate transfers to a more favorable environment. The offender has to come forward with specific information to say, Offender A is a problem with me. I cannot be in the same neighborhood. That way the prison officials are given an opportunity to investigate and evaluate the risk. But merely saying I'm in fear here, I want to be transferred, isn't going to be enough to warrant a transfer to a different institution. Otherwise, we would have offenders using that sort of information to manipulate a transfer. In this particular case, the case wasn't tried as if this were a snitch case. This case was tried in a non-jury trial to the bench. Mr. Walls had claimed that the prison officials had failed to protect him from assault. The underlying problem in this case is that objectively there was an enemy system available for him, and subjectively the actions of the prison officials before, during, and after the assault established that they did what had to be done. After the fight, they investigated it. They took reasonable measures. Before the fight, they had a system available. During the fight, there was quick action. There's no allegation that the prison officials didn't do enough. And what perhaps underlies this case is that Mr. Walls was convicted of fighting in all three cases. This is different than maybe the particular case where an offender is simply assaulted and does not provide any response. This is a case where there was an actual exchange of blows, and Mr. Walls himself was disciplined on all three occasions. Therefore, the state of Iowa, in this case the Iowa prison officials, assert that there is sufficient evidence to support the finding of the court, and there was no errors at law. And unless there are further questions, we'd certainly waive our remaining time, and also would like to thank the Washington University of Law School and Brian K. for their assistance to Mr. Walls in this case. Thank you, Mr. Hill. Counsel, you have about a minute of rebuttal left, I believe. A little less than that, but we'll give you a minute. I apologize. I meant to say reserve instead of yield. Just one quick point, Your Honor. Much has been made of the fact that Walls denied protective custody and that he didn't respond, he didn't have a sense of danger to himself, and that's just simply not true. Walls requested transfer on a number of occasions, and while that itself is not enough to identify a threat of harm to him, he also, immediately after the disciplinary notice was issued, requested placement in protective status, administrative segregation 5 status. That's in the disciplinary notice of appeal, where the warden identified that he had been facing problems walking the yard. He also initiated this action, seeking a preliminary injunction to get the officials to respond, to finally respond to protect him from the risks that he faced as a snitch. In his grievance, he sought action from the officials, stating at the very end, you made me a snitch, now protect me. All we ask is for this court to remand this case so that the district judge can apply the correct constitutional standard and consider all of the evidence on the record. Thank you. Thank you, Mr. Boylan. The court wishes to also thank Brian Cave and the law school for their assistance in representing the plaintiff in this case. I'm sure he's appreciative as well. Thank you, counsel, both, for your argument and attendance this morning. Consider your case submitted. We'll render a decision in due course.